Ruffin, Chief Justice.
 

 — The opinion given in the Superior Court, upon the question of evidence arising on the deposition of Terry, conforms to the rules laid down in this Court, in
 
 The State
 
 v.
 
 Boswell,
 
 2 Dev. 209; and those rules, we think, are based on sound principles, and correctly drawn from the most approved writers on the law of evidence. The witness says, that he knew Dawes, to whose discredit he is examined, for several years; that he did not consider him an honest man; that he had known him to steal, and that he would not believe him upon oath. The opinion of the witness is obviously founded upon particular facts within his own knowledge; and cannot be more admissible than direct evidence of the particular facts themselves, on which that opinion is founded. Evidence to such particulars is incompetent, both because it would
 
 *85
 
 be a surprise on the witness, and render trials so complicated, that they could never be terminated.
 
 Barton
 
 v.
 
 Morphes,
 
 2 Dev. 520. The
 
 opinion
 
 of a discrediting witness is competent, when professing to be founded on
 
 general belief,
 
 that the witness to be discredited is dishonest, or of bad moral character. This is going far enough, and , _ , seems not to be warranted by principle, it we are to regard the opinion of the discreditory witness, as standing upon its own force alone; but that is not the ground of receiving it. The opinion of the individual is heard, not as of itself establishing the want of credit of the impeached witness, but as the best means in the power of the ness under examination of communicating to the jury the
 
 extent of the general belief
 
 to the disadvantage of the other'*" witness. The opinion of one person, that another is a dishonest man, and therefore that his testimony is not credible, is not evidence of
 
 character,
 
 but of facts ; and is the weakest evidence of facts. The only opinion worthy of consideration, is, that from general reputation, the witness is unworthy of belief. That opinion no person can give, who makes the preliminary statement, that he does not know what other persons think of the witness, but that he speaks from his own knowledge. He must not only know' what other persons think of the impeached witness, but he must profess to know what other persons, generally, think, before he is competent to state his character, or his inferences from that character. The character which goes to the credit of a witness, is that imputed to him by general reputation, and that only.
 

 The Court is further of opinion, with his honour, that tbe plaintiff had no right to read that part of the deposition of Dawes, which speaks of the declarations of James Dow-ney. Those declarations were.irrelevant to the issue; for what James Downey said, that S. S. Downey had said, could not establish the declarations of the latter, nor any fact inferable therefrom. The party who took the deposition, could not have read that part of it, if objected to on the other side. Nor is the Court bound to hear it, if not objected to on either side, because it is irrelevant, and burdens the trial, to the delay of business. The party
 
 *86
 
 cannot be bound to read, what the Court is not bound to hear, and will not hear. Consent of both parties, or the act either, cannot render irrelevant evidence competent. The evidence in question, w’as not barely to a collateral fact, but was, in every stage of the case, altogether irrelevant to the subject of inquiry. There are many collateral facts that are not irrelevant; such as the disposition of the witness, or his relation to the parties; his declarations about the controversy at other times; which may have a material bearing upon his credit. As to such points, it is a disputed question, whether the answers of the witness to interrogatories in the course of his cross-examination, are conclusive, upon which no opinion is now necessary. If the party calling the witness, examine him without objection to such points, undoubtedly the other side may contradict him. The counsel for the plaintiff has endeavoured to put this case upon that footing. We think the argument is defective, both because the matter to which the witness deposes, is not simply collateral, but is immaterial, and therefore incompetent; and because the party who took the deposition did not examine to those points. Depositions are taken in this state, without an exhibition of interrogatories in Court, or to the opposite party, and without their being settled by any officer prior to the examination. They are also, often taken in the absence of the party, and without any interrogatory, except that implied in the oath. Such was the case here. We- think the voluntary statement of the witness, under such circumstances, of irrelevant and incompetent matter, cannot be regarded as a statement drawn out by the party. No doubt he is still the witness of the party, who can neither discredit him, nor suppress his deposition. But he is not obliged to read it, as being made evidence in all its parts, simply because the witness was examined at his instance. He cannot discredit his own witness ; but the other side cannot call on him to furnish them the means of discrediting the witness. When taken, the deposition is evidence for either side, so far as its contents are in themselves competent, and no further.
 

 Having considered these points, that which arises upon
 
 *87
 
 the instructions to the jury is next presented. It is one of much importance, both .in its bearing upon the interests of these parties, and as a general question of law. His honour first stated to the jury, as we conceive, correctly, that to the validity of a will a disposing capacity was necessary, and a knowledge of the contents of the instrument ; and that in point of law, such a knowledge was presumed from the fact of execution, if the capacity was satisfactorily established. But he further stated, there were cases which required a different rule; and, applying the exception to the case before him, he proceeded to lay down these principles to the jury: That a will being written by a legatee was in law a suspicious circumstance; the suspicion being greater or less in proportion to the interest : that when a will was written, by one taking a large and beneficial interest, for a testator in his last illness, and great weakness from disease, and the writer was a confidential agent and adviser of the supposed testator, it was necessary in support of the will, to produce some evidence to show a knowledge by the testator of the contents of the will, as that it was read to him, or by him, or, if not so read, that it was written from instructions and according to them, which would be sufficient.
 

 The instructions assume that in point of law, the validity of the will, depends upon such proof; and that in such a case, the inquiry is not one of fact, whether the maker of the instrument actually knew, or was actually ignorant of the contents of th^ paper; but is an inference of law, either that he did not know them, or that it does not appear, and it ought to appeal;, by plain proof, that he did know them. The correctness of the instructions depends therefore upon the inquiry, whether by the laws of this state, these are inferences of fhct to be drawn by the jury, or are to be stated by the Court as fixed legal principles.
 

 In support of the opinion of the Court, many cases have been read from the Ecclesiastical Courts of England; in which the rules laid down to the jury, are stated as
 
 rules ox principles,
 
 which govern those Courts. But those cases and the terms in which the Judges deliver themselves, are far from satisfying us, that the nature of the inquiry makes
 
 *88
 
 it, in a Court of Common Law, the province of the Judge and not the jury to determine it. The Court of Probate *n England, decides every question both of law and fact, which the case presents ; the capacity of the testator, in all its various gradations as perfect, doubtful and defective. Where of the last kind, the instrument is necessarily inoperative under all circumstances. But where a testable capacity is found, the degree of proof that the instrument was freely executed, and that its provisions were really assented to by the maker, must necessarily vary with the degree of capacity, in order to satisfy a rational mind, that there was such free agency, knowledge and assent as the law demands. That tribunals-such as the Ecclesiastical Courts, constituted of a single Judge, holding the Court permanently, and deciding the whole case, should, in the course of repeated discussions of evidence of a similar kind, adopt, for the ease of the Court, and for the information of suitors, some propositions, as the measure of that proof, to be deemed sufficient or insufficient under particular circumstances, is not surprising. To the usefulness of such a ’Court, such rules, as
 
 principles
 
 for the government of the Judge, are indispensable. They are requisite, both to relieve the Judge from unnecessary
 
 labour,
 
 and to exclude the suspicion and the danger of unlimited and irresponsible discretion upon all questions of fact; which, in a permanent magistrate is intolerable. Hence, in the very able opinions which have been delivered by the Judges of those Courts, are constantly found expositions of the'reasons, on which the credit to be given to the witnesses ought to rest, and on which inferences of particular .facts may be rationally drawn from certain evidence; and such reasons, and the determination to which they led in one case, are naturally appealed to by counsel, and acknowledged by the Court in succeeding cases. At first they may be respected only as the conclusions of an able, well instructed and experienced mind, well calculated
 
 to
 
 influence another mind to adopt the same conclusions. But they soon acquire the authority which a succeeding Judge is neither able nor willing to deny to them, of being
 
 precedents.
 
 For, as has been forcibly remarked, it is the professional ten
 
 *89
 
 dency to repose on precedents ; and it is fortunate for the institutions of every country, that there is such a tendency.
 

 That the principles upon which the Ox*dinary in England requires particular proof, to rebut the presumption of fraud in obtaining a will from a man of weak or impaired faculties, are obligatory upon each succeeding Judge who may sit in those Courts, seems to be a settled point in those Courts. Nor can it be denied, that those principles have been most carefully considered and cautiously settled. They address themselves forcibly to every rational mind; and were most properly urged against the instrument offered for probate in this case. The Court is not to be understood as pronouncing them insufficient to repel all the presumptions drawn from the execution of the instrument by a testator in the condition of mind and body imputed to Mr. Smith by the witnesses. Upon its sufficiency or insufficiency this Court would carefully abstain from intimating any opinion; and allusion is made to it, only to prevent the supposition, that our decision rests on a difference of opinion between us and his honour upon the weight to which the evidence was entitled. On the contrary, we think the question is, whether either Court can determine its weight; in other words, whether the inquiry be one of fact or law ? That question cannot be determined by the decisions of the Ecclesiastical Courts, for whether the nature of the inquiry be of the one kind or of the other, the remarks, rules, principles, by which one great Judge was guided in the discussion, weighing and deciding on evidence of a particular character, in a particular case, would be authoritative on another upon the like evidence in a like case. The question depends upon. the nature of the inquiry according to the common law of England, and the statute laws of this state. For although the question is one of probate, and therefore might appropriately be governed by that portion of the ecclesiastical law which is incorporated into the common law and administered in peculiar jurisdictions; yet it has seemed good to the legislature to refer it to a tribunal of a different nature, a jury. That tribunal is the favourite of the common law as the arbiter of facts; and not less so with the
 
 *90
 
 legislature of this state than with our ancestors. For not only is the decision of all facts within the power of a jury, but in this state it is exclusively their province to decide them, uninfluenced by the opinion of the Judge upon the weight of the evidence, or its sufficiency to prove any fact in dispute. To the jury any argument may be urged impugning, or enforcing deductions of one fact from another proved, or from the defect of full proof of either the one fact or the other; and the opinions of men of able and practiced minds may properly be laid before them in argument, as likely to influence their judgment by the force of the reasoning which led to those opinions, or by the authority of the opinions themselves, coming from such sources. But it is impossible to say, that such a tribunal is bound as to a conclusion of fact, by the precedent set by another tribunal for the decision of facts, whether consisting of a single Judge, or of the numerous Judges who compose a jury. There is no
 
 law
 
 to such a body but its conclusions upon the evidence as to the fact sought.
 

 Is there a principle to be found laid down anywhere in the common law, as a positive precept, that
 
 it is necessary
 
 to the validity of the will of a man, written in his last illness, and when very weak from disease, by one who takes a large legacy under it, and was the confidential friend and adviser of the alleged testator, that those who offer the will should distinctly prove, besides the testable capacity of the maker, and the due formal execution of the instrument, the further facts, by distinct evidence, that the maker knew and approved of the contents of the instrument? If there be such a proposition, it has escaped our researches among the treasures of the common law. It is the principle of that code, that a paper obtained by duress or undue influence, or by deception, and without the free consent of the maker, given upon a knowledge of its provisions, is not a will. But that the want of such knowledge and consent are legal conclusions from evidence that the supposed testator was worn down by disease, and that the writer of the paper derives a large benefit under it, is nowhere found; nor that the like conclusion is absolutely to be drawn from those facts, with the additional
 
 *91
 
 one, that the writer was or was not a stranger or a confidential- friend of the testator. After proof of capacity' and execution, the common law lays down no rule upon the subject; but submits the general question to the jury for a decision, according to their conclusions upon the actual facts of undue influence, imposition on the testator, his knowledge of the contents of the paper, and assent thereto — under the comprehensive inquiry, whether a fraud has been practised. Where the testator’s situation is such as to render the perpetration of a fraud easily practicable, the jury may say, they are not satisfied one was not practised, and thence infer its existence,' unless the contrary be clearly shown. It is in the power of the jury, and may, as reasonable men, be their duty, for fear of fraudulent practices, and in prevention of them, to find a fraud, or to give a verdict such as they would if they had found a fraud, where there is a defect of proof to negative it. It is upon that principle, that ecclesiastical Judges regulate their judgments, as we understand them. But those are conclusions of fact, arising from evidence given or withheld.
 
 A defect of'proof,
 
 unless it be a
 
 total
 
 defect, is for the consideration of the jury, wherever the law requires the intervention of a jury. The ecclesiastical Judge can say, a case is not established, because it is reasonable to require in the particular case full proof, and to such and such points the proof is not full. So may a jury. But a judge, under our system of jurisprudence, cannot determine, when
 
 prima facie
 
 proof is offered, that the case fails, because further proof is not given. That the will was written by a legatee — that he stood in the relation of kindred, friend, or agent to the party, do not, of themselves, prove that the testator did not know or assent to the dispositions. They raise a suspicion of imposition, and make it reasonable to call for explanations. Such explanations may be given, as acknowledged in .these very instructions, by evidence of the actual reading of the will by or to the testator, or by proving its conformity to the instructions given for it. There are other circumstances equally satisfactory; such as the conformity of the will to previous or subsequent declarations, or to such dispositions
 
 *92
 
 as the party would be prompted by natural affection to make. /The intimacy of the relation between the writer and the testator may be, and is even .less suspicious, than if they were strangers; upon the supposition that each draftsman writes himself heir. These considerations must satisfy the mind, that upon such a subject, the law cannot lay down as a test, that a will is, or is not, valid, when executed under any one or more of the particular circumstances mentioned; but necessarily refers the facts upon which its validity legally depends, to the decision of the jury, under evidence as to all the circumstances attending its preparation or execution, the condition, mental and physical, of the testator, the contents of the instrument, and the benefits provided in it for those actively concerned either in the preparation or execution. Evidence to each of these points may have an important bearing upon the just conclusions to be formed of the testator’s capacity, and of the advantages that may have been taken of his weakness or confidence; and a jury may justly be alarmed at the danger of exposing testators to importunities and imposition, which would follow from establishing papers to be wills, when obtained ira
 
 extremis,
 
 and under suspicious circumstances, unless those suspicions be removed by affirmative and plenary evidence, that the testator comprehended the dispositions made for him, and fully and freely sanctioned them. But like other questions of actual intention; of the state of the mind; of influence; knowledge or ignorance of one person, and of integrity or dishonesty and fraud of another; this question is one of fact, to be decided by the jury upon evidence; which, in the opinion of the Judge, is competent, as tending to establish any of those facts. Its tendency, it is the province of the Judge to explain, by stating what conclusions may be drawn from it; but whether it establishes a fact, or whether a conclusion deducible from it, is or is not rebutted by other evidence, is the province of the jury to say.
 

 That the rules of the Ecclesiastical Courts, although most sensible deductions of facts, are not parts of the law of this country, but only of the law of those Courts, we deduce, not only from the manner in which the Judges
 
 *93
 
 in those tribunals speak upon this question, but from the nature of the subject itself. But furthermore, the questions which arise before the Ecclesiastical Courts upon the probate of testaments, arise also in the Courts of Common Law, in ejectments on devises, or on issues out of Chancery, to try the validity of the will. Yet none of the principles on which the Ordinary makes deductions from evidence given or withheld, have been incorporated into the common law, so as to be laid down to the jury, as conclusions drawn from them. The evidence is submitted to them, that they may draw their own conclusion. For this very reason, the chancellor will not determine the validity of the will, but always sends it to an issue,
 
 devi-savit vel non ;
 
 and upon that issue and in ejectment, the verdict is frequently at variance with the judgment of the ecclesiastical Judge on the same instrument, offered in his Court as a testament.
 

 For these reasons, we think there was error in stating it as a proposition of law, that the evidence supposed was necessary to the validity of the paper as a will. It should have been left to the jury to say, whether they thought, from the evidence given, that the presumption from execution, that the party knew the contents of the paper, understood them, and assented to them, was in fact rebutted by the state of his mind and health at the time the will was prepared and executed ; by its contents, and by the circumstances relied on by the defendant; or was confirmed by its contents and by the evidence to the testator’s knowledge of them, and other circumstances offered on the other side., The case must therefore be submitted again to the jury.
 

 PjgrCuiiiam. Judgment reversed.